DAVID K. BOYLAN and others, appellants, *and* ISAAC MEEKER and others, respondents.*

When, in a controversy about the probate of a will, it was alleged that the paper offered for probate was not a genuine will, but that it was surreptitious or procured, and was never executed by testator as his will, it was held that, in that aspect of the case, it was competent for the caveators to show that the provisions of the will in controversy were contrary to the expressed intentions, views, and feelings of the deceased before the time it bears date, and to his declarations subsequently made.

The will offered for probate held, after an elaborate review of the evidence, to have been fraudulent and surreptitious, and not executed by the testator.

The costs and counsel fees of the party offering the will for probate were ordered to be paid out of the estate, because of the absence of direct proof of fraud on the part of the party offering it, or of knowledge on his part that it was surreptitious, although he was a large beneficiary under it.

This cause came before the Ordinary on an appeal from a decree of the Orphans Court of the county of Essex, refusing

---

* See *Boylan* ads. *Meeker*, 4 *Dutcher* 274.—Although this very able and interesting opinion of Mr. Justice Potts was delivered as long ago as 1854, and is almost exclusively confined to a discussion of questions of *fact*, the reporter has thought proper to publish it here (greatly out of its chronological order) in order that our reports may exhibit all the *phases* of the litigation arising out of this remarkable case in our state courts. It may be added, that an action of ejectment was brought by a party claiming under this will in the Circuit Court of the United States for the District of New Jersey, which resulted in a verdict for the plaintiff, thus establishing by the verdict of a jury in that cause the genuineness and validity of the will.

to admit to probate a paper purporting to be the last will of Jonathan M. Meeker, deceased, propounded by David K. Boylan, who was named as one of the executors in the will, and to whom large legacies were given by it.

The decree appealed from also denied costs and expenses to the party propounding the paper.

The case was heard in the Prerogative Court, before the Honorable Stacy G. Potts, one of the associate justices of the Supreme Court, who was called in to hear it by the Ordinary.

*Bradley* and *W. Pennington,* for appellants.

*Frelinghuysen* and *A. Whitehead,* for respondents.

POTTS, J.   The Orphans Court of the county of Essex, on the 15th June, 1853, decreed that a certain paper, propounded for probate in this cause, marked *Exhibit A,* and bearing date the 12th day of January, 1852, is *not* the true last will and testament of Jonathan M. Meeker, the alleged testator therein, &c., and that the same has not been well proved, and ought not to be established or admitted to probate, &c.  From this decree David K. Boylan and others appeal to this court; and the question is, whether there is error in that decree.

The testimony and exhibits taken and made in the court below are before us.   The case is one of much importance, the evidence very voluminous, and in some of its aspects singularly conflicting and embarrassing.   The case has been most elaborately and ably argued; and I have endeavored to give to it a careful, patient, and attentive examination.

The deceased was an old gentleman, of about seventy-two years of age, residing at New Providence, in Essex county. The paper propounded as his will is alleged to have been executed by him on the evening of the 12th January, 1852, at the house of Mr. Jonathan E. Hoyt, and in the presence of Hoyt's family; and to have been taken away by him when he left the next morning.   It is further alleged, that some weeks afterwards—from one to three or four—he brought

it again to Mr. Hoyt, and deposited it with him, and that it was then enveloped and sealed up, and remained in Mr. Hoyt's custody until some ten days after the testator's decease, which occurred on the 22d day of May, more than four months after the time of the alleged execution. It was then opened, and deposited by Mr. Hoyt with the surrogate, and subsequently offered for probate.

I propose to consider the questions presented by this appeal in the following order.

I. Did Jonathan M. Meeker, the deceased, actually execute a will at the house of Jonathan E. Hoyt on the evening of the 12th January, 1852 ?

II. If he did, was he at that time of sound and disposing mind, memory, and understanding ?

III. And if both these questions are settled in the affirmative, the only remaining inquiry will be, is the paper offered for probate *that will ?*

I. Then as to the alleged execution of a will at Hoyt's at the time specified.

Hoyt lived about eight miles from the residence of Meeker. Two witnesses, *Valentine* and *Bonnell*, testify, that on the afternoon of the 12th of January, 1852, half an hour to an hour before sunset, the deceased called upon them, in New Providence, with a sleigh and pair of black horses, and wanted, first one, and then the other of them, to go with him to Newark. Said he was going there that night to stay with *Isaac Miller*, and that his business was to sell his horses to the plank road company, as he had no hay for them. He offered *Valentine* $5, and *Bonnell* $3 or $5 a day to go with him, but they declined.

Next we find him at Hoyt's, some five miles out of the direct road from New Providence to Newark. That he came there that evening, somewhere between dusk and eight o'clock, with a sleigh and two black horses; that he took tea, remained all night, and went away next morning after breakfast, is proved by the concurrent testimony of *Mrs. Maria*

*L. Hoyt,* the wife, *Anna, Elizabeth,* and *Mary Hoyt,* the daughters of Jonathan E. Hoyt, *Charles Kilgee,* the coachman, and *Patrick* and *Sarah O'Shaughnessy,* servants, who resided in the family at the time. All except the O'Shaughnessys testify that Hoyt was *not at home* when deceased came—that he inquired for Hoyt, said he had business with him, and had his horses put up for the night before Hoyt returned. *Hoyt* swears that he found him there when he returned home from New York that evening. *Patrick* testifies that Hoyt *was at home* when deceased arrived, and *Sarah* says she believes he was at home. *Valentine* says he thinks deceased subsequently told him that he had stayed at Hoyt's the night he had desired witness to go to Newark with him. There is nothing in the evidence to contradict these witnesses upon this point; and it must be taken as an established fact, that the deceased spent *the night of the* 12*th of January,* 1852, *at Hoyt's house.*

Then as to the evidence of the execution of the will. *Jonathan E. Hoyt,* one of the subscribing witnesses, testifies, in substance, that he had no notice or premonition of the intention of Mr. Meeker to execute the will before he found him at his house that evening. That Meeker then told him he *had come to make his will,* or have it executed, and wanted him, Hoyt, to witness it. After he had made known his business, says Hoyt, *I* invited him into *another room,* and deceased said, I now want you to witness my will. I asked him if he had got his will drawn. He said he had. He then took it out of his pocket or pocket-book, and read it to me, and asked what I thought of it. I told him I *thought he had done very liberally by his wife, taking into consideration her age, and the property which she already had,* as he said, in her own right. I then told him I thought, as he had asked my opinion, that he had probably given too much to Mr. Boylan, although I did not know the value of the property. I then asked him if he had not better alter that part of the will. He said no; if he was to alter it he would give him more, and he wanted no dictation. I then asked him why he

asked my opinion in regard to the will. He said, out of mere courtesy. I then asked him if it would not be more judicious to give his nephew, Jonathan M. Meeker, of Elizabethtown, some part of what he had there given Mr. Boylan. He said no, he had given Jonathan enough, and he would spend, no doubt, what he had given him in his will in a few years; and furthermore, he had a great dislike to his, Jonathan M. Meeker's wife. I then told him that his nephew had named his youngest son after him, and would it not be better to do something for him, and less for Mr. Boylan. He said names did not cost anything, and he wanted no more dictation. I then told him I was not acquainted with any of his legal heirs-at-law, except Mr. Jonathan M. Meeker and Mr. Jonathan M. Muir, and of course I had nothing more to say in behalf of any of his other nephews and nieces, and if he was determined that that should be his will, I would get some one to witness the will with me. After this conversation, we went into the other room, where the family was. I then told him, in the presence of the family, that I thought he had better see Mr. James F. Meeker, of Elizabethtown, and show him the will, and consult him, as he was a gentleman that I had confidence in, and was an old acquaintance of his, and I presumed Mr. Meeker would think as I did with regard to giving Mr. Boylan as much as he had. He said he did not wish to consult any one what he should do with his property—all he wanted was to have the will executed. He spoke of his nephews and nieces in general terms, and seemed to be willing that Mr. Boylan should have, as he said, the lion's share out of his estate, as he always found a comfortable and hospitable home at Mr. Boylan's house, and if property would make him a man, he should have the opportunity. He further said, (this was when we were alone)—he had taken this matter thoroughly into consideration, had made a good many wills, and the last one previous to this he had given his wife but $1000 in her own right, with the use of certain other property; and at the time he made the will, he said he was mad, and he was determined not to give his

wife much; that she had troubled him a good deal when he wished to convey lands, by withholding her name from the deed, and he invariably had to buy her off. I said to him that I thought the will he then wished to execute was altogether more to his credit than the September will. He then said, you refused to witness that will, and now you are not willing to witness this. I told him I thought there were objections, in my mind, to both of them, but I was not willing to witness any man's will that was worth what he said he was, giving his wife only the pitiful sum of $1000 in her own right.

Of the fact of the execution, he says, being shown the paper purporting to be the will, he has seen that paper before; the handwriting of "J. Edwards Hoyt" to the attestation of the will is his. The signature, "Anna Hoyt," to the attestation of the will is hers—he saw her write it. The signature of "Jonathan M. Meeker," signed at the foot of the will, is the handwriting of the testator—he saw him write it. The signatures "Jonathan M. Meeker," on the margin of the several leaves of that will, is testator's—he saw him write the signatures. He says that himself, his daughter Anna, and some or all his family were present at the time; that he started to go for a neighbor, a Mr. Brown, to be a witness; that it was storming, and he did not go; that himself and Anna witnessed the will at testator's request. He describes particularly the manner in which the will was executed—on a portfolio laid on the table—the testator signing it first at the foot; then putting the seal on; testator's putting his two fingers on the seal, and saying, this is my will—I wish you to witness it for the purposes within mentioned; that the attesting witnesses then subscribed their names, and then the testator wrote his name on the margin of the several leaves. He says the attesting clause was written by himself at testator's request; and that after the will was executed, witness enveloped it in a sheet of letter paper, and the testator put it in his pocket-book or pocket. He says the testator read the will once to him in the private room, and once in the

presence of the family on that occasion; that he assigned, as a reason for writing his name on the margins, that it made it stronger, and he had done it before on other wills, and as a reason for coming to Hoyt's to execute it, that he wanted to make a *private will;* that he had made a good many wills, and talked too much about them, and was determined to have one will the world should know nothing about.

*Anna Hoyt,* the other subscribing witness, details the history of the execution of the will with great particularity. She was the first witness examined. Her account is substantially similar to that subsequently given by her father. She says her father, mother, and two sisters were present at the time; that testator *read over the will in their presence and hearing* before he executed it, and talked about it some time before affixing his signature. That her father told Mr. Meeker he had much better go somewhere else to get it executed. Mr. Meeker said he could have it done nowhere as *privately* as he wished, and it was only at his most urgent solicitations that Mr. Hoyt finally consented. Mr. Hoyt told him he thought he had not been liberal enough with Mrs. Meeker; that Mrs. Meeker had always been very economical, and had done as much to acquire the property as he had. Testator replied, that he had made her a much more liberal allowance than he had made her in a will he had previously made in the autumn; that she was advanced in years, and would have no use for any property long; and at the same time said that he did not come there to have Mr. Hoyt dictate his will; that he knew what to do with his own property without consulting any one; that it was his own property, and he should do what he chose with it. He said that he liked none of his relations; that he liked Mrs. Meeker's much better than his own; that he had had several plans for giving his property away from his relations entirely, but that some of them were in quite needy circumstances, and he had concluded to help them all a little. Mr. Hoyt asked him if he had no brothers or sisters living. He replied that he had one brother who was wealthy, and had only one child,

and that he would give him nothing—that he had enough for himself and his child. Mr. Hoyt asked him what had become of his favorite plan of establishing the *Meeker Institute*, of which he had been always talking. He replied, that he thought it on the whole a foolish plan, and that the money would do his relations more good; that the town of New Providence would never thank him for it after he was dead and gone; that the grass would grow over his grave, and his grave-stone fall before any of them would take the trouble to set it up. Mr. Hoyt told him he thought he had given Mr. Boylan too much. Mr. Meeker said, no more of your dictation; as I told you before, I wish no interference with regard to the disposition of my property from yourself or any one else. I have always thought a great deal of Mr. Boylan; he has always treated me very kindly and hospitably, and is a very promising young man, and I intend to do all that money can to make something of him. He also spoke of Mrs. Boylan, and said she had always treated him with uniform kindness. He spoke of his relations by name, but not knowing them, and having never seen any of them, with one or two exceptions, it would be impossible for me to recollect what he said in regard to them. He said he had twenty or thirty nephews and nieces; that he did not care for any of them; that if there had been any of them equal to Mr. Boylan, he should not have hesitated what to have done with all his property. He spoke of having aided some of his relations; but not knowing them, witness does not recollect with any particularity who they were whom he had aided; that they had always squandered what he had given them, and it had been of no use; that he had no doubt that all he had left them at his decease would be spent in three or four years.

The witness said further, that she saw her father write the clause of attestation; that Mr. Meeker said he had *got the will written in New York*—that he had got some person there to write it, but does not recollect that he mentioned who; that the reason he gave for writing his name on the margin of each sheet was to make the matter sure, so that no one

could mistake it; it was done of his own accord, without any one suggesting it. She says the testator used a gold pen— he tried several before he found one that suited him, and wrote his name several times, so as to show us what a hand- some writer he was. He said there were so many young ladies looking at him he must do his best.

To subsequent questions put to the witness, she said—the conversation on the subject of the will, on the evening of its execution, commenced after Mr. Hoyt's return; Mr. Meeker stated in substance, that he had come there on important bu- siness—that he had come to have his will executed. Mr. Hoyt told him that he had hoped he would make his will some- where else, and leave him a handsome legacy. Mr. Meeker replied that he had enough already, and had no idea of doing anything of that kind. Then Mr. Meeker asked Mr. Hoyt if he could not see him in another room for a few minutes. They went into another room and stayed a short time, and returned with the document. The seal was put on the will in her presence; her sister cut it—she saw her do it.

This is the testimony of the two subscribing witnesses as to the execution of the paper, and the circumstances attend- ing it. Then we have the evidence of three other witnesses, who were present at the time. Mrs. Hoyt, the wife, and two other daughters of Mr. Hoyt, Elizabeth and Mary L.

*Elizabeth Hoyt* testifies that she remembers Mr. Meeker's visit in January; that her father was not at home when he came. When her father returned, *Mr. Meeker told him he* wished to speak to him in private, and they went into ano- ther apartment. He told her father he was sorry he did not find him at home on the occasion of a previous visit he had made to the house between Christmas and New Year, and had hoped to have seen him at New Providence. Her father told him he had had no time to go there. They were not long in the room, only a few minutes. They returned to the sitting-room, where the family then were. Mr. Meeker said he wished to have the will which he held in his hand executed. There was some little conversation, and Mr. Meeker sat down

by a lamp, and read the will. He read the will aloud. When he read what he had given to Mrs. Meeker, he stopped a moment, and *some one spoke, and said he had done very little for her ;* that he had not given her half what he ought to have done. He said she had given him a great deal of trouble about the execution of papers—that she would not sign her name to papers without some compensation—that it was more than she could spend. He then spoke in regard to a bequest he had made to a niece who was deranged. Some one remarked that he had not given his brother anything; he said his brother had enough, more than enough, and that he should not give him anything. After he had read what he had given Mr. Boylan, Mr. Hoyt told him he thought he had given him too much. Mr. Meeker said he did not come to be dictated to. There was considerable conversation—a great deal that I can't remember. Mr. Hoyt told him he had better take the will to Elizabethtown, to a lawyer there, I think by the name of Meeker, and have it executed there; that he knew nothing about his relations, personally or otherwise, and that he preferred to have nothing to do with it. Mr. Meeker said he *wished it to be perfectly private ;* that if he took it to the person Mr. Hoyt designated it would soon be noised abroad what he had done with his property, which he did not wish. Mr. Hoyt told him he was sorry he had not executed the will somewhere else, and given him something. There was some little joking about that, and Mr. Meeker said he had enough already. Mr. Meeker asked which of the young ladies would witness the will; he said that it *was necessary that some person besides Mr. Hoyt should witness it*—that *two* witnesses were necessary. Mr. Hoyt said he preferred some person else should witness it besides one of his daughters, and he started to go for a person living near us—Mr. Brown. Why he did not go I don't remember. My impression is it stormed, or Mr. Meeker objected. I think he asked me if I would witness it. He said I had the same name as his wife; he had a peculiar fancy for the name, and asked me to witness it. I think I had seen more of him than my other sis-

ters. I told him no, and he asked my sister Anna, and she consented to do so. I got pens and ink and paper, and a pair of scissors, and cut a seal, as he requested me to do. I had forgotten to state that, before the seal was affixed, Mr. Meeker requested my father to write something at the end of the paper, which he did. He wrote a few lines. Then Mr. Meeker took up the pens, examined them, and asked for a quill pen. The pens were gold pens, four or five of them. I went and got some quills, but no one had a pen-knife. He said that he could not write with metallic pens, but preferred quill pens. He wrote his name on a piece of paper several times, until he found a pen which he liked among the gold pens. He remarked that he could write better than any of us. After a while—after some little conversation about the pens—he put his finger upon the seal affixed to the will, and said it was his last will and testament for the purposes within mentioned. It was the usual form, but I have forgotten the exact words. My father and sister Anna afterwards wrote their names. Mr. Meeker wrote his name on the margin of the will, whether before or after my father and sister had signed their names can't say, don't remember. After the will was signed, there was some conversation. *Mr. Meeker took it, and put it in his pocket-book*—I should think a pocket-book; he put it with other papers. I think there was more conversation, after he put the will in his pocket-book, between him and my father. After the will was executed, he *requested each one of us that we should not mention it to any one.* He gave, as a reason, that his relations were always talking about his property, and his disposition of it, and he was determined to keep *one thing from them.*

*Mrs. Maria L. Hoyt* testifies that she recollects the execution of the will; that she was present most of the time; it was in the early part of January, 1852, severely cold weather and snow on the ground. Mr. Meeker came in a sleigh, between sunset and dark; the will was executed between seven and ten in the evening. He came alone; I saw him first in our dining-room; he came in with his overcoat;

inquired for Mr. Hoyt; Mr. Hoyt was not at home. He said he was anxious to see him, but gave no reason for wishing to see him. He was told that Mr. Hoyt was expected home soon; and Mr. H. did come about seven o'clock—my impression is he, Hoyt, had been to New York. Think testator took tea with the family. From his arrival until Mr. Hoyt came home he was in the dining-room seated, talking with the family. He had been relieved of his overcoat, and his horses taken to the stable before Mr. Hoyt returned, and he had said he should stay all night, and had given directions about his horses, and his blankets in particular, not to have them put on the horses, as they were new. He said he considered his horses *sold to the plank road company.* He requested a private interview with Mr. Hoyt as soon as he came in, or not long after; they went into what we call our winter parlor, and were there for a time, can't say how long, should not think more than half an hour. They then came out with a paper, which I understood from Mr. Meeker was a will. Mr. Meeker had the paper. He had on, or put on his spectacles, and read it aloud. I did not hear it all, as I was out of the room once or twice, but I heard the most of it. He signed his name after the will was read. My daughter Elizabeth prepared a seal in my presence and in the presence of us all, and he declared the will to be his will. Mr. Hoyt and my daughter Anna witnessed it. Mr. Hoyt, I think, wrote something at the bottom of it—I don't know what it was—it was written at Mr. Meeker's request. I objected to either of my daughters witnessing it. Mr. Hoyt started for a neighbor of ours—Mr. Brown; for some reason or other he did not go; it was snowing, I think, quite fast. There was considerable discussion about the different bequests. Mr. Hoyt and my daughter Anna witnessed the will at Mr. Meeker's request. He, Meeker, signed it, I think, more than once; on the margin of some or all the leaves, besides at the foot. Mr. Hoyt, myself, and three daughters, Mary, Anna, and Elizabeth, were present. I was not present all the time it was being read—I was while it was executed;

the others were present during the time, as far as I know. There was considerable conversation in regard to the pen; he did not like the gold pen, he liked quill pens best. He said he was a good writer—could write better than any of us. I don't recollect all the discussion (about the will), because I did not know the parties. I told him I thought he ought to be liberal with Mrs. Meeker, as there were no children. He said he had given her more than she would ever want; he said she had a good deal of her own; he said they had always had separate interests, and he had been obliged to give her from time to time to get her to sign his papers; he spoke, while reading over the paper, about the niece he had that had been deranged; he said she was in the Retreat, I think; I don't remember her name; I think he said she was a daughter of his sister; he mentioned her name while reading over the bequest to her. He spoke also of a niece of his wife—I think her name was Tully—said she would probably be Mrs. Meeker's heir; he said he liked her very much; he mentioned several other of his relatives as he read, but I don't remember their names. He said he had thought of giving money to a *seminary or institute*, but I *understood he had relinquished the idea*, but did not wish the people of New Providence to know it; he said he had given them some encouragement for such an institution, and they would be angry if he did not—would make it uncomfortable for him— be angry enough to ride him on a rail. I think there was *a provision in favor of D. K. Boylan;* Mr. Hoyt rather insinuated that he thought he was pretty liberal with him; testator said he thought Mr. Boylan was a very fine young man, and he wanted he should have a good start in the world. He rather resented suggestions made by Mr. Hoyt in regard to the will, and seemed to think he knew what to do with his own better than other people could tell him. Recollects there was a provision in the will for Jonathan M. Meeker, jun.; heard him speak about that before. He said he had acquired a large property, and now there was *no one to give it to that he cared for in particular*, to whom he would like to give the

bulk of it. In speaking of Jonathan M. Meeker, jun., the nephew of his, he said he had received many kindnesses and much assistance from his father in early life, and liked him very well, but *did not like his wife.* He said he would give, or had given him something handsome. She thinks, *when the will was executed, the testator put it in his pocket-book.*

*Mary E. Hoyt* is the last witness examined in reference to the execution of the will. She is a daughter of Jonathan E. Hoyt, and says she was present at the time. That testator came alone with a sleigh and two horses about dusk; that as soon as he came in he sent word to the man who took his horses not to put the blankets on them, and said he considered them as *good as sold.* Her father was not at home. Testator inquired for him—took off his overcoat—warmed himself at the register—took tea—and said he was anxious to see Mr. Hoyt, and had business of great importance, which must be attended to at once. When Mr. Hoyt returned, *testator said he wished to see him on business,* and they retired to another room, the winter parlor, at *testator's request*— were absent perhaps fifteen minutes—the room was warm— they took a light with them. They returned together. Testator then had a paper in his hand, said it was a will which he wished to have executed. He sat down at the table, and read it aloud; my father, mother, two sisters, Elizabeth and Anna, and myself were present. The paper was then executed in our presence, about seven o'clock. I saw testator sign his name on the bottom of the page and on the margin of the leaves. After he had put his name to the bottom of the page, he put his hand on the seal, and said it was his last will and testament for the purposes therein mentioned. The will was then witnessed by my father and sister Anna at testator's request. I think they witnessed it before the signatures were made in the margin. He said he made those signatures that there might be no mistake about it. He used a metallic pen—tried it several times on a piece of paper— said he was a good writer, and could write better than any of us. The execution of the will and the conversations about

it occupied *an hour and a half or two hours.* He asked my sister Elizabeth first to witness the will; she objected; my father proposed some one should be called in out of the family; he objected to that—said he wished it to be kept private, and preferred one of the others to witness it—asked my sister Anna, and she did it. My father started for a Mr. Brown to witness it—Meeker was opposed, and it stormed at the time. Father had been to New York that day. The testator *read the entire will, as far as I know.* After it was executed, *he put it in his pocket.* Father wrote a few lines just before the signing of the will, at the end of it, at testator's request. I saw the signatures of father and Anna at the time they were made. We were all sitting at the table in the centre of the dining-room. Looking at the paper, she says the clause beginning "in witness," &c., is her father's—she saw him write it. I saw the signatures of Jonathan M. Meeker, J. Edwards Hoyt, and Anna Hoyt made.

We have, then, the testimony of five witnesses to the *fact* of the execution of a will by the testator on the 12th January, the day of the date of the attestation. True, the credit of one of them, J. Edwards Hoyt, is seriously impaired by evidence in the cause, but the other four are in no wise impeached. They narrate all that occurred, and much that was said on the occasion, with great particularity. Their statements in the main corroborate each other. I can discover no discrepancies, indeed, which might not be expected naturally to exist in the recollection of five persons as to a series of acts and conversations and circumstances occurring several months before the examinations took place. That Meeker was at the house of Hoyt at the time cannot be questioned. In themselves, considered apart from all the other facts and circumstances in the cause, there is nothing in the narrations given by these witnesses which strikes the mind as extraordinary or unnatural.

It is difficult to imagine how the *fact* of the execution of *a will could be* more directly and positively proved. There seems to be no reasonable ground to doubt that *a will* was

executed by the testator at the house of Jonathan E. Hoyt on the evening of the 12th January, 1852. In such statements as we have here, with all these circumstances, these details, these minutiæ, this corroboration, and this compactness and agreement as a whole, I repeat *there can be no doubt* as to the fact of the execution of some such paper as the one now in question by the testator on the occasion referred to.

Taking it, then, as a fact clearly established in the cause by evidence, the force of which cannot be resisted—that *a will was executed*—

II. I pass next, in the order in which I propose to examine this subject, to the question : *Was Jonathan M. Meeker, at the time of the alleged execution, of sound and disposing mind, memory, and understanding ?*

1. A number of witnesses were examined upon this point. On the part of the caveators, witnesses testify that, in the latter part of testator's life, in their opinion, his *mind was very much impaired,* so much so that they think he was not competent to conduct his own business; that his memory had failed to a great extent; that sometimes he was unable to count money or calculate with accuracy; sometimes in conversation he appeared insane or childish; for six months before his death (he died in May, 1852,) his health went down, both body and mind. In the latter part of November, or first of December, 1851, Mr. Brookfield had an interview with him, and thinks that at that time he was not of sound mind or capable of attending to business. He was sometimes troublesome in business matters. Once made a proposition to Mr. Valentine in reference to his, testator's, wife, which indicated insanity, if intended seriously. In conversation he would fly from one thing to another—his discourse disjointed—not totally beside himself, but childish—had no power of self-control on subjects that excited him—was sometimes perfectly infuriated on such subjects. Letters and papers in his handwriting are produced which indicate that his mind was at times little better than a chaos of confused ideas,

while other papers—the will, particularly of September, 1852, show that at other times he understood himself very well, and could express his thoughts intelligibly on paper.

2. He is shown to have entertained many *visionary ideas.* He endeavored to persuade Jotham Potter that money could be made by erecting a *factory* on a small stream which in a wet time ran down the side of a steep hill, but the bed of which was dry in common times. He would buy *stock* sometimes, and offer to sell it, *as he said,* for less than cost, admitting that he did not know why, he purchased it; that immediately after doing so, he saw he was injuring himself, and sometimes *thought himself that he was not fit to do business;* he talked very extravagantly about the natural advantages of *New Providence,* and how it might be made a great city; he very often put an absurd *valuation* on his property, and sometimes offered to give away property; he had an idea that a great water-power could be created by tunnelling *Long-hill* and draining the great swamp, and had very extravagant notions of the feasibility of such a project and its results. On one occasion, he called on Mr. Brookfield, of Morristown (one of the commissioners), to complain that the books of subscription to the stock of a contemplated railroad from Elizabethtown to Morristown had not been opened— was quite excited about it, and Mr. Brookfield had to assure him the books should be opened, at a particular time and place, to appease him; he said he would be there, and if the stock was not all taken in two hours he would take it himself. It would, the witness supposed, have taken $300,000 to build the road. When the time appointed came, the testator did not attend. He would say that his wife had royal blood in her veins, was related to the reigning family of England, and ought to be on the throne; talked of a vision he had about it, and of going to New York to have it written out. Proposed to bet Mr. Corey $1000 that he would raise 2600 bushels of corn on about ten acres of land; told him he believed he had a lizard in him, his mouth was so bitter; talked to Mr. Minton, of Chatham, about building a road

round a mill-pond, and putting a steamboat in it, and said he thought people from New York would patronize it, and said very many strange, idle, and foolish things.

3. On subjects of an exciting character he had become very violent and unreasonable. An act was passed, in 1850, authorizing the common council of Newark to take lands for public parks, and the council having taken some of his lands for that purpose, he was extremely exasperated, and denounced without stint or measure the law and council and everybody that had anything to do with the measure, and often talked and acted in reference to that subject wildly and irrationally—" wild as wild could be," as some of the witnesses express it. He thought the act unconstitutional; that the conduct of the council was good cause for revolution—better than the colonies had—and sometimes talked largely of raising one—threatened to flog one of the aldermen, and whip the whole council; came to the legislature to get the law repealed in the winter and spring of 1852, and annoyed everybody he met exceedingly by his obtrusiveness, irritability, and childishness; applied to a printer, Mr. Hull, to print a pamphlet for him on the subject, and offered to pay any price for it, which Mr. Hull declined, thinking him not in his right mind. On the subject of taking his land for a park, several witnesses, members of the legislature and others, say his mind was so much excited that he could not be called sane in their opinion, and many facts and circumstances in regard to his conduct in that matter are detailed, which undoubtedly furnish strong ground for such a conclusion. He offered to give McCormick a large part of the park lot if he would build an arcade or bulkhead there. His valuation of his lot at $20,000, far more than it was really worth; his offer to give Amos Wilcox somebody's note for $1000 as a present; his affirming, on one occasion, that he could get 500,000 people in Newark to sign a remonstrance against the law respecting parks, and similar indications of a wild recklessness in conversation, are exhibited in the testimony. And it is in evidence that from the time the trouble about

the park began seriously to affect him, his health and strength, both of mind and body, gradually failed.

Such is substantially the scope of the evidence adduced by the caveators to prove that, on the 12th of January, 1852, the testator was incompetent to make a will. I am of opinion that the evidence does substantially establish the proposition, that there were periods, during the winter of 1851-2, in which the deceased was *not* of sound and disposing mind and memory—periods in which his faculties were so much impaired as that he had no rational comprehension of the subject matter with which he dealt—in which he might have done, in reference to the disposition of his property, what his returning reason and judgment would not have sanctioned—periods in which he might have been made the victim of an artifice by one who had carefully studied the character and condition of his mind, and in whose way he had happened to fall at a time favorable for such an attempt.

It must, however, be admitted that this was not by any means the *habitual* condition of the deceased's mind during the last year of his life, embracing the winter of 1851-2. And it is a most important fact in this cause that in the opinion of the subscribing witnesses to the will, and of the others who were present at its execution, the deceased was of sound mind *at the time* of the execution. Speaking of his condition on the evening of the 12th January, *Jonathan E. Hoyt* says the deceased understood what he was about; considered him a sharp, shrewd man; saw no difference as to his mind, memory, and understanding from what he had been when he first knew him. *Anna Hoyt* says "he was of good capacity and understanding." *Elizabeth Hoyt* says, "from what she saw of him at the time the will was executed, he was of sound disposing mind and memory." *Maria L. Hoyt* says that at the time he appeared sound for aught she saw—she saw nothing that led her to doubt or suspect the soundness of his mind—he appeared calm, composed, and conversed as usual. *Mary E. Hoyt* says she saw nothing at the execution of the will but what was in perfect keeping

with his former conduct and character—he seemed to understand fully the nature of the instrument he was executing— she considered him of sound mind—saw nothing to the contrary—he was perfectly calm and composed, and remarked upon the different provisions of the will as he read it aloud, &c. There is, too, much testimony as to his *ordinary* state of mind of a favorable character. *Mr. Harriot*, in November or December, 1851, went with testator to the common council, when the (to him) exciting subject of the appropriation of his property for a park was before them, and testator was endeavoring to get the aldermen to protest against their final action, and says he was perfectly coherent and sane— mind not off its balance in the least—appeared as he had for three or four years—always thought him a shrewd man. The same opinions substantially as to his state of mind, in the winter and spring of 1851–2, are expressed by *Archibald Woodruff, William Johnson,* and some twenty others of his neighbors and acquaintances, among whom are Doct. Pierson and Doct. Darcy, gentlemen not likely to be deceived on such a subject with their opportunities of judging. *Doct. Pierson* says, "I always considered testator of a peculiar temperament of mind—he was very opinionative and very tenacious of his own views, and seemed to get readily excited if others did not think as he did on every and on any subject. He seemed to think himself always as certainly correct in his own views of a subject, and that others ought to yield to him if they differed from him. I have never discovered any want of understanding or mental capacity." *Doct. Darcy* speaks of his situation in February, 1852, when he came to Trenton in reference to the law respecting the Newark parks; talked with him, and says he did not discover that he was any way deficient in the state of his mind—was the same as formerly, except what might naturally arise from a person of his make of mind owing to advanced years.

It is in evidence that, up to the period of his last sickness, he was in the habit of attending to and transacting his own business—bought and sold—collected and loaned out money

2 E*

—gave directions to his lawyers about the conduct of his legal business—travelled a good deal from home—and no instance is produced, in the history of his business transactions, of his making a foolish bargain with anybody, or sacrificing any of his property or interests in the latter part of his life. His visionary ideas exhibited themselves in *talking* rather than in *acting*—he talked of the profit of such enterprises as building factories on wet weather streams, or putting steamboats in mill-ponds, or tunnelling Long-hill, but he never put his own hand to any such enterprises; he said he would take the whole stock of a railroad company, and build the road, but he did not take a share; he proposed bets and made offers to give away property, but he made no bets and gave no property without an equivalent. Nor do I think the evidence establishes the fact, that there was positive mental *delusion* even in his wildest extravagancies. He did not fancy things to exist which *did not* exist, and could not by any possibility have an existence in the nature of things. Many opinions to which he gave expression in serious moods might be opinions against reasonable probability; but error in judgment, in opinion, in belief, is not *delusion.* That a water-power *might* be created by tunnelling Long-hill—that a pond of several acres might be beautified and made attractive—was true; the first was a project others had thought of as well as Mr. Meeker. Mr. Potter *had* a stream on his land which in wet weather would turn a mill. The appropriation of his land for a public park was a fact. There was, it seems, some old tradition that the Townley family, from whom his wife descended, was related to the royal blood of England—a dream it might be, but it did not originate in his mind.

Now all this evidence, taken together, can hardly be considered, I think, as going further than to establish the fact that there were *occasions* when his conversation and conduct were inconsistent with what might be expected in a man of sound intellect. But when the intellect is impaired at all, the question as to the extent of capacity remaining becomes one

of the most difficult of all questions to deal with; and when we are called upon to form an opinion as to the mental condition of a man from his conduct and conversations, it is essential that we should understand, if we can, the original character-istics of the mind we are contemplating, in order that we may compare the mental phenomena relied upon to establish insanity, with that exhibited when the subject was confessedly sane.

According to the testimony of witnesses who had known the testator a long time, he was a man of singularly marked characteristics. He was generally esteemed as possessing more than ordinary strength of mind—shrewd, sharp, of great mental and physical activity; exacting, avaricious, persevering, determined, and obstinate. His property and affairs were generally his principal topics of conversation—he was boastful of his wealth, power, capacity, and informa-tion. Was very talkative—talked very largely, told strange stories about the products of his farming operations—talked largely of public improvements and schemes. Had a high opinion of his legal knowledge—was habitually dictatorial, and pursued his purposes with indomitable energy. Was rather visionary in his cast of mind—and more in the habit of suggesting visionary projects than attempting them. There was, one witness intimates, a good deal of what is called *humbug* in his conversation, and this appeared to increase very rapidly for two or three of the last years of his life. "He was," says Mr. Magee, "a curious man, and it wanted a wiser head than mine to understand him always." "He had," says Mr. Dougherty, "peculiar ways with him, which you would have to become acquainted with him in order to understand." He had as many projects for making money and improvements, and talked as largely as any man you could find." He was a man of strong prejudices and passions —impulsive, irritable, ungovernable in his temper, and when provoked his resentment knew no bounds—and all these characteristics became more prominent as age and debility crept on.

Now, comparing the evidence as to the testator's general
character of mind with what is detailed of his conduct and
conversations about the time of the execution of this will,
and looking at the circumstances which were present and
operating with their influences upon him—advanced age,
enfeebled from physical disease, irritated extremely by the
proceedings of the Newark councils in taking his lands un-
der what he thought an unconstitutional law, I confess I am
unable to reach the conclusion that he had what may be
called a uniform capacity.    Indeed, while the weight of evi-
dence is, I think, clearly in favor of his capacity when in or-
dinary health and free from causes of excitement, yet it was
no doubt to some extent a *fluctuating capacity,* greatly im-
paired at times, and occasionally sinking into the imbecility
of second childhood.

But as the case stands here upon the question of the *com-
petency of the deceased at the time of the execution,* I have no
hesitation in saying, upon the evidence before the court, that
his competency is proved.

III. The question of identity remains.    *Is the paper pro-
pounded for probate the same will which was executed by the
testator on the* 12*th of January ?*

The caveators take the ground, that however conclusive
the proof may be that a *will* was executed by the deceased
at Hoyt's, and though he may have been sane at the time,
yet that *this paper cannot be his last will and testament.*
That there is overwhelming evidence to show that he always
considered, spoke of, and acted upon the provisions of another
will as his last will, that there are strong grounds to believe
that this paper is not genuine, and that if a will was executed
by him at Hoyt's it was subsequently destroyed.

This, it seems to me, is really the only question of serious
doubt in the cause, and it demands a careful consideration.

It will be remembered that the witnesses who testify to
the execution of a will at Mr. Hoyt's on the 12th of January,

all agree that after the paper had been executed, the testator put it in his pocket or pocket-book.

No witness except Jonathan E. Hoyt testifies to having again seen this paper until early in June, after the testator's decease.

*Jonathan E. Hoyt* says, that on the evening of the 12th, before retiring, the testator requested him to take and keep the will, which he reluctantly consented to do; that they breakfasted next morning about nine o'clock; that before leaving, the testator said *he would like to take the will with him, in order to show it to some friend or friends,* and that *he gave it to him.*

No witness is produced, however, to whom the deceased *ever showed such a will.*

Mr. Hoyt testifies that the deceased afterwards *brought the will back to him;* that he enveloped and endorsed it, and put it away with his own papers. The envelope, so endorsed, was seen by the other witnesses who were members of his family, but the paper endorsed was not seen by any of them until June.

*Anna Hoyt* says she next saw the will, meaning the *envelope,* after its execution, in Mr. Hoyt's desk, and recognized it when it was taken from the envelope and opened according to the directions on the envelope. When she first saw it in her father's desk it was enveloped, and had written on it "Jonathan M. Meeker's will," and the time it was to be opened. The envelope being shown her, she recognized it as the same. Ten days, as she understood, after Mr. Meeker's death (which would be the second of June) the will was opened and read in the presence of the witness and the other members of Mr. Hoyt's family, at Mr. Hoyt's house, and by him —*none but the family being present.* Witness looked at it— cast her eye over it at the time, but did not read it entirely. She was in the room when it was opened, but don't recollect seeing the seal broken. She never saw the will from the time Mr. Meeker put it in his pocket-book until she saw the envelope in Mr. Hoyt's desk; *when the envelope was removed*

from the will she recognized it as the same document she had witnessed.

*Elizabeth Hoyt* says she knew the will was in her father's possession for some months previous to testator's death—all the family knew it. She had seen it in the envelope (that is she had seen the envelope). She recognized the envelope shown to her. It was among her father's papers, and she had seen it whenever she arranged them. That her father was about taking it with him to Mr. Meeker's funeral to give it to Mrs. Meeker, but being reminded of testator's directions, he changed his mind. That six, seven, or perhaps ten days after the decease, *her father broke the envelope* in witness's presence and read the will, and said he was going to take it to the surrogate, and requested witness to write to Mrs. Meeker informing her of the fact, which she did. It was the same will she had seen executed.

*Mrs. Maria L. Hoyt* says she saw the envelope, in which the will was several weeks after the execution, with Mr. Hoyt's papers. She identifies the will produced as the one she saw executed, and thinks the envelope is the same. When she saw the envelope it was sealed. Thinks it was opened and read at her house on the day it was taken to the surrogate's office. As *far as she heard and recollects* the contents of the will, they are the same as read by the testator at the time of the execution. Upon reading the will now, witness has no doubt it is the same read at her house. She says she recollects, and gives the reasons why she recollects, *several* of the bequests mentioned.

*Mary E. Hoyt* says she *should think*, from the appearance, this is the same paper—the same handwriting in the body of it. She saw the will taken from the envelope, eight or ten days after Mr. Meeker's death, by her father, and heard him read it. Its contents appeared the same that testator read. She had seen the envelope once in her father's drawer. She saw the seal of the envelope broken.

This is, in substance, all the direct evidence we have in relation to the question of the identity of this paper with

that which was executed by the testator at Mr. Hoyt's, and which at the time he took away with him.    I have already said that no witness but Mr. Hoyt himself proves the fact of the testator's returning the paper to him—all that the other witnesses know is, that they saw an envelope afterwards among Mr. Hoyt's papers, which, as they understood and believed, contained that paper, and that when, after the testator's death, Mr. Hoyt broke the seal of this envelope, and exhibited the paper it contained, and read it to the members of his family, they believed it to be the same paper—and they certainly speak with confidence as to its being the same paper.    A period of nearly five months had however elapsed since they had seen the will executed.

We are then to consider the evidence produced on the part of the caveators below in opposition to the conclusion that this paper is the last will of the testator.

1. And first, it is insisted that the place where this will is alleged to have been deposited, and from whence it is produced, is calculated to cause suspicion.    It was never seen or heard of by anybody out of the Hoyt family, as far as is certainly known, until several days after the testator's death. No one but Jonathan E. Hoyt testifies to having seen *this paper* between the 12th of January and the 1st of June.    It is then produced by Mr. Hoyt as the will executed by the testator at his house, in the presence of himself, his wife, and three daughters, on the night of the day it bears date.    And *why should this paper have been deposited with Hoyt*, is significantly asked.    There is certainly nothing in the cause to induce the belief that the deceased was *particularly intimate* with Mr. Hoyt, and there is some testimony to show that he *distrusted him*.    It seems that, on one occasion, Hoyt had proposed to lend deceased a large sum of money at a low rate of interest—afterwards offered to lend him $1000 without interest for a year, and it ended in his handing deceased $30, for which he, Hoyt, took his note; that Hoyt also bought a cow of deceased for $27, took a bill of sale, gave his note for the money, and left the cow, and deceased became suspi-

cious that there was some design in thus obtaining his note and bill of sale, and became anxious to get up his paper from Hoyt—refused to lend him money, and wrote to Jonathan M. Meeker to go with him to Hoyt's on the 27th December, 1851, and "try to settle my business with him," as he expressed it. It seems that deceased did go there about that time, and stayed all night and part of next day without seeing Mr. Hoyt, who was from home; that on the 10th of January, he sent Hoyt's note to his house by Mr. Wilcox, with a request to have his own note in exchange, but Wilcox found Mr. Hoyt was absent, and returned the note to him, as he thinks, the next Monday, but is not sure it was the 12th; and it is argued that deceased would scarcely have trusted Mr. Hoyt with the custody of his will, if he was so suspicious of his character as to be afraid to trust him with papers that had his signature.

2. In the second place, it is insisted that the *conduct of J. Edwards Hoyt*, before, at the time, and after the alleged execution of the will, furnishes ground for just suspicion of fraud; that his gratuitous offers to lend Mr. Meeker large sums of money, his getting his note for $30, and a bill of sale of a cow, which he did not eventually take away, were schemes to win the deceased's confidence and get his signatures. It appears, by Mr. Hoyt's testimony, that he spent a night at the deceased's in March, 1852, and on that occasion, he says, the deceased took him into a room, and read parts of several old wills he had made, and that Hoyt then prepared a new will for him, and this, counsel insist, was contrived by Hoyt, and is another link in the chain of evidence to prove that he was possessing himself with the materials out of which to make a surreptitious will.

Again, it is proved that, in the winter of 1851–2, Mr. Hoyt, applied to Murray, assessor of one of the Newark wards, to find out, as he said, the value of the testator's property in that ward, and obtained from him a statement of all his real property in Newark, with its location and character. This is adduced as another link in the same chain. And, as

it appears that the deceased had once offered to sell Hoyt his Ohio lands, and Hoyt knew what his real estate in New Providence consisted of; that with this information from Murray, he was in possession of knowledge of all the real estate of the deceased which is mentioned in the will of January 12th.

Then we have the evidence of Mr. Carr, that about the 10th of March, 1852, he saw a paper in Mr. D. K. Boylan's office in Newark, endorsed "Jonathan M. Meeker's will;" that he opened it, and read the commencement, "In the name of God, amen. I, Jonathan M. Meeker, of the township of New Providence," &c.; that Boylan and Hoyt came in; Boylan took the paper, and went, or said he was going to New York, and he and Hoyt went out together. Carr's character is assailed, but Mr. Samuel Wilcox testifies that he mentioned this circumstance to him soon after. Again, Mr. Hoyt admits he had made inquiry as to whether Boylan's word could be relied on—thinks it was after testator's death; but gives a singular reason for doing so, to wit, that Mr. Meeker had remarked to him, at the execution of the will or after that Mr. Boylan, *being executor, would have to get some one to give bonds for him,* and asked him, Hoyt, if he would do it, and that Boylan had applied to him, as he supposed, for the same purpose; whereas both Meeker and Boylan must have known that executors are not required to give bonds.

Again, Mr. Hoyt states, in his testimony, that he never informed Mr. Boylan of the existence of this will previous to the eleventh day after testator's death, and yet Mr. Parsons testifies that, in *less than a week* after Meeker's death, Mr. Boylan came to the surrogate's office, informed him of Meeker's death, inquired when caveats must be filed, and said he *was an executor* in Meeker's will; though he had been at the funeral, heard the September will read, and therefore knew he was not an executor in *that will.* Some stress is laid, too, upon another fact. The testator died on the 22d of May. On the morning of that day, Hoyt says he was in Newark,

on his way to New York, and met Boylan, who told him Mr.
Meeker had been quite sick, and *made an appointment* with
him to call at his, Hoyt's, house that evening, on his return
from New York, *and take him up to Meeker's.*   Boylan did
call, according to appointment, and Hoyt went with him to
Meeker's, and found him dead.   Vanderveer testifies that,
on that day, Boylan hired a wagon of him to go to *Daniel
Pearson's;* that he did not return until about two o'clock at
night—and told him subsequently, that on his way to Pear-
son's, where he was going to a *party,* he met a messenger,
who told him Mr. Meeker was very low, and was not ex-
pected to live, and he went there.   The fact is there was no
party at Pearson's that night, and the wagon was undoubtedly
hired to go to Meeker's, according to the appointment made
with Hoyt.   Why, it is asked, is this equivocation—why does
Mr. Boylan conceal, on the 22d, the fact that he is going to
Meeker's?   Why does he arrange with Hoyt to go with him,
if he at the time knew nothing of this paper?   Mr. Hoyt
had the will in his pocket, as he says, at this visit, and went,
intending to get rid of it, but finding Mr. Meeker dead, he
took it back with him, saying nothing to Mr. Boylan about it.

3. In the third place, it is urged that *suspicion attaches
to this paper itself.*   It has never been discovered who pre-
pared it—it is in a handwriting unknown; some of the wit-
nesses present at the execution testify that the testator said
he had it drawn in New York or Newark, but though the
question of probate was in litigation for a year before the
Orphans Court at Newark, and the testimony of the drafts-
man would have been of vital importance—probably abso-
lutely decisive—*he has not been found,* nor does it appear
that any effort was made to find him.

Again, it is in evidence that the deceased had drawn seve-
ral previous wills himself, some of which are produced, and
yet, excepting the name, "Jonathan M. Meeker," signed at
the foot and on the margin of the three half sheets which
compose it, there is not a word in or about this paper which
is pretended to be in decedent's handwriting.   There is a

contrariety of evidence as to the genuineness of the signatures of the deceased's name—they are made better than he usually wrote in the latter part of his life—but it is impossible to say with certainty, upon the evidence or upon inspection, whether they are genuine or not. I pass by two or three slight alterations apparent on the face of the paper. I do not see that anything can be inferred from them which will very materially affect this question. There is one name in it—Halsey Meeker—which in all the other wills is written Caleb H. Meeker; but if the January will was written from the dictation of the deceased by a stranger this error may readily have occurred, as the deceased sometimes called him *Halsey*—and the same remark may be made as to the alterations apparent.

4. In the *fourth* place, after the death of the testator, a will, drawn by himself, attested the 25*th September*, 1851, and duly executed, was found uncancelled in the testator's desk at his dwelling house. It is written on twelve pages of foolscap—manifestly prepared with great labor and care. All the wills previously made were either destroyed, cancelled, or mutilated, showing testator's habit when he made a new will. This will was executed less than *four months* prior to the date of the paper offered for probate. It makes several *very different dispositions of the testator's property* from this, showing, if this will be genuine, that the deceased's mind had undergone, in that short period of time, a change, in this respect, to certainly a remarkable extent. For example:

1. The *September will* gives Mrs. Meeker, his widow, his farm and forty acres of woodland, stock and furniture *for life*, $1000 in cash, and $400 a year, in lieu of dower. In this paper she has the farm, stock, furniture, &c., absolutely, and $4000 in cash, without barring her dower.

2. The *September will* gives his nephew, Jonathan M. Muir, the above farm and land, after his widow's death, for his life, then to his children, &c. In this paper he has a house and lot in Newark and $1000, &c.

3. The *September will* gives John Meeker, Deborah Hand, Daniel H. Meeker, Isaac Meeker, Theodore and Joseph Wilcox, Josiah F. Muir, Caleb M. Muir, Jonathan M. Noe, Jonathan M. Pierson, Jonathan M. Fisher, Deborah Muir, and Mary Muir, each, specific legacies. In this *paper* they are not mentioned by name at all.

4. In the *September will*, eighteen lots of land and $5000, and the interest of $5000 more, are given for the Meeker Seminary. In this paper he is made to say he has changed his mind, and gives nothing for such an institution.

5. In this *paper* $500 is given to A. C. M. Pennington, $500 to O. S. Halsted, jun., $300 to Richard Townley, $1000 to the Methodist Church at New Providence, $500 to the Central Methodist Church at Newark, and property, variously estimated at from $12,500 to $20,000, to D. K. Boylan, none of which legacies are found in the *September will*.

6. In the *September will*, his widow, James T. Meeker, Jonathan M. Muir, and Isaac Meeker, jun., are executors. In this *paper* D. K. Boylan and the widow are executors.

7. The *September will* goes into great detail, contains numerous directions to his executors, advice to his legatees, and couples many of the legacies with limitations and conditions, and I believe mentions every piece of property he owned. This *paper* contains nothing of this kind, except a desire that his widow should occupy the homestead, &c., and omits entirely the Morris county land. No one can read these two instruments without being forcibly struck with this difference. Not a trace of the peculiarities of mind, which appear on every page and in almost every line of the September will, is to be discovered in *the paper* here produced. And the same striking dissimilarity is apparent between this paper and all the previous wills drawn by or for the testator. It is a fact, however, to be remembered in this connection, that the testimony of the ladies of Mr. Hoyt's family shows that several of these dispositions *were* contained in the will executed in January.

8. Again, it is argued that the January will is an *un-*

Boylan v. Meeker.

*natural* will, inasmuch as it diverts a large proportion of the estate from the blood relations of the testator, contrary to the long settled intention of the testator, as indicated by former wills. This paper, when compared with three former wills, one in 1846, one in 1848, and the September will of 1851, to some extent furnishes ground for the argument, but there is not much substance in this objection when examined closely. The legacy to *Boylan* is probably not much greater or less in value than that in the other three wills given to found the *Meeker Institute*, and the January will does not give a greater proportion of the estate to strangers, including charities and to Mrs. Meeker and her relations, than some of the other wills; for it is important to remember here, that though this paper omits to mention most of the testator's nephews and nieces by name, and gives them no specific legacies, yet the entire *residue* of the testator's estate, which he says will amount to a very large sum, is given to those of them who are not otherwise provided for in the will. A tabular statement of the dispositions of the four wills will show at one view how the facts are. I give merely the substance of the different bequests and devises, omitting descriptions, values, conditions, and limitations annexed to them, &c.

| Legatees. Meeker blood, principally nephews and nieces of testator. | *Will of* 1846. | *Will of* 1848. | *Will of Sept.,* 1851. | *Will of Jan'y,* 1852. |
|---|---|---|---|---|
| Jno. Meeker ..,.... | House and lot | House and lot and $3000.,. | House and lot | ................. |
| Deb. Hand......... | House and lot | House and lot and $2000... | House and lot | ..... ............ |
| Daniel H. Meeker | $500 ...,........,. | $2500..,........ | $500........... | ................... |
| Phœbe Roberts... | $100 a year... | Farm........... | Int. of $2000, | Int. of $2000. |
| Abij. Pierson...... | Ohio farm..... | Ohio farm & $6000......... | Ohio farm..... | Ohio farm. |
| C. H. Meeker...... | House and lot | House, lot, & $2000......... | House and lot | House, lot, & $500. |
| Almira Meeker... | $100........... | ................. | ................. | ................ |
| Fred. Meeker...... | Lot of land... | ............,..... | . ............,.. | .,.............. |
| Jona. M. Meeker | House & lots, | House, store, & $3000 ..... | House and lot | House, lot, & $2000. |
| Isaac Meeker, nephew............. | Land, 23 a., &c. ......,..,. | Lots & $2000 | Lots as before | ................. |

2 F*

Boylan *v.* Meeker.

| Legatees. | Will of 1846. | Will of 1848. | Will of Sept., 1851. | Will of Jan'y, 1852. |
|---|---|---|---|---|
| Theodore and Jos. Wilcox | House and lot | House, lot, & $1000 | House and lot | .................. |
| Jona. M. Muir | Farm at N. P., &c. | House, lot, & $5000 | Farm at N. P., after widow's dec., & $2000, and 40 a. lot, | House, lot, & $1000. |
| Josiah F. Muir | $1000 | $4000 | $1000 | .................. |
| Caleb Muir | House & store | House, store, & $2000 | House & store | .................. |
| Deb. Muir | House, lots, & $200 | House, lot, & $1000 | House and lot | .................. |
| Mary Muir | House, lots, & $200 | House, lot, & $1000 | House and lot | .................. |
| Albert Meeker | Lot of land | .................. | | |
| Jona. M. Noe | Lots of land | Lot of land | 40 a. in Morris co. | .................. |
| Jona. M. Pierson | Lot | Lot | 10 acres | .................. |
| Jon. M. Fisher | 6 acres | 7 acres | 7 acres | .................. |
| I. Meeker, brother | .................. | $3000 | .................. | .................. |
| Jas. F. Meeker, of Elizabethtown | .................. | .................. | .................. | $500. |
| *Mrs. Meeker and her blood.* | | | | |
| The widow | House in Newark and $400 per annum | Farm at N. P. and $5000 | Farm at N. P. for life, 40 a. lot, $400 per an., & $1000, | Farm at N. P. and $4000. |
| Rich'd Crane | Lot of land | .................. | .................. | .................. |
| David A. Crane | House and lot | .................. | .................. | .................. |
| Jos. W. Crane | Lot of land | .................. | .................. | .................. |
| Jon. T. Crane | Lot of land | .................. | .................. | .................. |
| Agnes Tully | Lot of land | .................. | .................. | $1000. |
| Clark Townley's children | 60 acres | .................. | .................. | .................. |
| Harriet Crane | $200 | $200 | .................. | .................. |
| Rich'd Townley | .................. | $500 | .................. | $300. |
| *To strangers.* | | | | |
| The girl Violette, | House and lot and $150 | House and 25 acres | House, lot, & $200 | Int. of $500. |
| A. Whitehead, for services | $1500 | .................. | .................. | .................. |
| David Johnson, son of J. A. J. | .................. | $500 | .................. | .................. |
| Jno. A. Johnson | .................. | .................. | .................. | $500. |
| A. C. M. Pennington | .................. | .................. | .................. | $500. |
| O. S. Halsted, jun. | .................. | .................. | .................. | $500. |
| Isaac Miller | .................. | .................. | .................. | $500. |
| D. K. Boylan | .................. | .................. | .................. | Property in Newark, estimated at from $12,500 to $20,000. |

Boylan *v.* Meeker.

| Legatees. | Will of 1846. | Will of 1848. | Will of Sept., 1851. | Will of Jan'y, 1852. |
|---|---|---|---|---|
| *Charities.* | | | | |
| Franklin st. Ch., Newark ......... | $300........... | $200........... | ................. | ................. |
| Meeker Institute, | Land & $10,-000........... | Land & $10,-000........... | Land & $10,-000........... | ................. |
| Pres. Ch., N. P.... | ................. | $1000........... | ................. | ................. |
| Meth. Ch., N. P... | ................. | $1000........... | ... ............. | $1000. |
| Cent. Meth. Ch., Newark ......... | ..... ...... ..... | ................. | ................. | $500. |
| Residue............ | Testator's nieces and nephews....... | Testator's nieces and nephews and some relatives of Mrs. M............... | Nieces and ne-phews of testator and his wife........ | Testator's nieces and nephews not before provided for in the will. |

It will be seen, by examining this statement, that the legacy given to David Johnson, by the will of 1848, is given to his father in this paper; that, with this exception, the only legatees in this paper, not mentioned in *any* of the former wills, are A. C. M. Pennington, O. S. Halsted, jun., Isaac Miller, and D. K. Boylan, and the Central Methodist Church at Newark; that while many of the nephews and nieces of the testator, who were specifically remembered in some of the former wills, are not named in *this* document, yet that the whole residue is left to them, to the exclusion of Mrs. Meeker's blood, and that, judging from the bequests of this paper compared with former wills, the residue to be divided will be larger under this than it would have been under either of them. The Meeker Seminary, Jonathan M. Muir, and the relatives of Mrs. Meeker are the principal losers, and D. K. Boylan the only large gainer by this paper produced as a will. The bequests to particular friends in this paper is not a novelty. In the fragment of a will, made by the deceased in 1834, he gives to three sons of Mr. White-head and one son of Gov. Pennington $500 each.

9. Again, it is contended that the provisions of the controverted paper are *contrary to the expressed intentions, views, and feelings* of the deceased *before* the time it bears date and his *declarations subsequently made.*

Evidence was admitted in the court below, on both sides, covering this ground, and I think rightly. The great ques-

tion in the cause is—*is the will here produced genuine?* The allegation, substantially, of the caveators is—that it is not; that it is surreptitious or procured by fraudulent means; that the deceased never executed *this paper* as his will. In this aspect of the case, I feel bound to look into the evidence in all the phases in which it was presented below.

And 1. In this paper produced for probate the *Meeker Seminary is abandoned.* It assigns a reason: "it has always been my intention, and I have made several wills to that effect, to establish in New Providence an institution of learning, to be called the Meeker Seminary; but on *consulting with good and judicious friends*, and on further reflection, I was advised to divide the residue and remainder of my estate, which will amount to a large sum, equally among my nephews and nieces." Now no person is produced with whom deceased so consulted.

*Again*, the project of a seminary at New Providence had been in his mind for many years; he spoke of it to Mr. Low as early as 1836 or 8; in his wills of 1846, 1848, and 1851 it occupies a prominent place. The deceased, on the 5th of May, 1852, only seventeen days before his death, told Daniel Jaroleman that he had in his will left $10,000 for a seminary, to be built in New Providence; that he had left it in the hands of trustees, &c. On the 23d or 24th of January he told Mr. Low that he had left $10,000 for the seminary; got a map, and showed him where it was to be located; it was to be called the Meeker Seminary, and he had appointed trustees for it—told who they were, &c. In February, 1852, at Trenton, he told Mr. Corey he had very recently made a will, and in that will he had appropriated a certain piece of property for the purpose of locating a seminary, called the Meeker Institute or Seminary, saying he had made certain endowments to the amount of $10,000. He spoke of the same thing to Johnson in April, 1852, and to Noe about two months before his death. Now here are declarations of the deceased, made subsequent to the date of this paper, which,

if he had executed such a will, and had not destroyed it, can be viewed in no other light than as deliberate falsehoods.

There is some evidence, on the other side, that at times, in the summer or fall of 1851, when speaking of the appropriation by the city of his lands, he threw out intimations that, in consequence of that act, he intended to abandon, or had abandoned the project of the Meeker Seminary; but this evidence is perfectly consistent with the supposition that he did, in January, make a will omitting that bequest, and subsequently changed his mind and destroyed it. But then, again, there is very conclusive evidence of the deceased's repeated *recognition of the September will, subsequent to* 12*th January*, 1852, in other particulars. About the 23d or 24th of *January*, 1852, he told *Henry Low*, who was on a visit at his house, that he had made a will last fall, as he had told him previously he was going to do; that he had left a house and lot to Mrs. Hand in Fair street—also one to John Meeker, and entailed it; told him what he had left the seminary—said Jonathan M. Muir, Isaac Meeker, and Mrs. Meeker were his executors—thought Muir would make a good executor. He told *Corey*, at Trenton, in February, 1852, that he had recently made a will—spoke of what he had left the seminary in it—spoke of the several distributions of his property—said he had made several wills previous to the last one, and in *this last will he had distributed his property to his own satisfaction, and he doubted whether he should ever make another.* In a conversation with *Lewis Clark*, subsequent to January 12th, he said he had given $10,000 to build the Meeker Seminary—that he had not given anything in his will to the Methodist Church at New Providence; he said he would give something, and wished witness to come to his house and prepare *a codicil* for that purpose. He said he had given Daniel Meeker $500; that he had given John Meeker a house and lot in Newark, and Deborah Hand a house and lot—think he said he had entailed them. On *May* 3*d*, 1852, Mr. Clark went to the de-

ceased's house. After a good deal of conversation about other matters, he asked Mr. Clark if he would act as one of his executors, if he made him one; Clark asked who his executors were, and he said his wife was executrix, and James F. Meeker, Isaac Meeker, jun., and Jonathan M. Muir were executors—(these are the executors named in the September will). Mr. Clark declined. Deceased asked Mr. Clark then if *he would write an addition to his will*—the codicil before spoken of in favor of the Methodist Church at New Providence. He got paper, ink, and pen, *and the will*, or what he *said was the will.* Mr. Clark asked him if he kept a will in the house with him? He said he had kept a will written by him thirty years—had never been without a will in the house for thirty years, as witness understood him. Then he wished witness to draw on paper his codicil, to see if it met his views. Then a question arose about putting a bequest of $500 from his wife, in addition to one of $1000 from himself, in the codicil, and the matter was postponed. Now this is an extraordinary fact. The will the testator produced, and to which the codicil was to be appended, was clearly not the paper we have here; for this paper, at that time, on the 3d of May, 1852, was, according to the testimony of all the Hoyt family, lying sealed up in the envelope among Mr. Hoyt's papers at Hoyt's house. This paper appoints different persons from those named to Mr. Clark by the testator as his executors, and this paper contains a bequest of $1000 to the very church at New Providence which it was the object of the proposed codicil to make.

Again, on the 15th January, only three days after the date of this paper, the deceased told Mr. Brokaw that he had left Jonathan M. Muir the homestead farm, seventy acres of land on Stony-hill, and $2000. He told Valentine, the last of February, 1852, that he had given Isaac Meeker, jun., the lots (mentioned in September will), and how he had provided for and endowed the Meeker Seminary (as in that will), and he repeated to him, in March, the gift to Isaac. Mr. Potter says he has heard testator mention the legacy to

the Meeker Seminary as late as within two months of his death. He told Linaberry, about the first of April, 1852, that he had willed a store and house to Caleb H. Muir. He said to S. Wilcox, in April, 1852, that he intended the lot the city of Newark was taking to raise funds to build a seminary at New Providence, that he had intended, or had left it by his will, and that he had given his, witness' brothers, two boys, a house in Newark, &c. He told Mr. Searles, since January 12th, 1852, that he had given Jonathan M. Muir the homestead, and told Mr. Noe, in March, 1852, that he had left a legacy to Isaac Meeker, jun. On the 18th of February, 1852, he wrote to Mr. J. T. Crane that he had set forth in his petition to the Newark council, (dated in August, 1851,) that he had ordered the property they were about to take to be sold, and the money appropriated to the erection and support of a school. On the 8th of March, 1852, he wrote the same in substance to Mr. Clark. On the 15th March, 1852, he writes to Mr. Crane, that if the law authorizing the city of Newark to take his land is not repealed, it will prevent his building a seminary. And on the 12th April, 1852, he writes to Bishop Janes, then presiding over the Methodist conference at Trenton, and asks the appointment of Mr. Murcle to the Methodist Church at New Providence, and of Mr. Tully as presiding elder, promising, *if these appointments are made,* to give $1500, &c., towards building a brick church there, and giving the bishop an account of his intention and plans in reference to the seminary. All these declarations and acts of the deceased, made and done subsequent to the 12th January, 1852, the date of the contested will, go to show, if the deceased was sincere in what he said and did, that he knew of no will but that of September. Then—

3. *The devise to Boylan.* The deceased had, in 1851, conveyed a lot in Newark to Boylan, under an agreement that Boylan should do all his legal business—so that he was under no obligations to Boylan. *Mr. Runyon* says that, on the second of *January,* 1852, deceased came to him to get a brief prepared,

to be used before the common council in opposing the project of taking his land for a park; that he, Runyon, suggested to him to get Boylan to prepare it, and his reply was, " I won't; *Boylan is a d—d rascal;* I have no confidence in him; I believe nothing would suit him better than for the city to take the property, so that he could get the money for the lot I have given him, and put it in his pocket." Subsequently he used, on another occasion, similar language in regard to Mr. Boylan. The first conversation, it will be seen, is only ten days prior to the date of the January will, and the second, Runyon thinks was about two weeks after, which would be very near the 12th January. He told *Col. Plume*, about the middle of January, 1852, he thinks, that he had lost all confidence in Boylan, and that he believed he would cheat him out of all his property if he could; that he was a great rascal—linked in with the city. [It may be stated in this connection, as a singular contradiction in the evidence, which can only be reconciled on the theory that some such will had been made and destroyed, that about the 13th, probably the very day after the Hoyt will is dated, when the deceased was undoubtedly in Newark, Mary J. Trimble says the deceased told her, at Boylan's office, that " he had left Boylan the property the city wanted to rob him of, and that was not all he had left him; that he wished Boylan to know all about his business, for he would have to settle it up after his death."]

*Mr. Keys* says that deceased told him, in February, 1852, that a lawyer, he thinks he called him *Bowling* or *Bolling*, and the corporation (of Newark) were concocting to swindle him out of the property. He told *Joseph C. Noe*, about the middle of February, 1852, that the city of Newark was trying to take a piece of land from him for a public park, and he had got Mr. Boylan to intercede for him; but instead of doing that he was working against him, and he believed him to be a damned rascal, or scoundrel, and he would not trust him with a dog's dinner. In the latter part of April, or the first of May, he spoke very much in the same

way of Mr. Boylan to *Henry Low.* He told *Mr. Corey,* at Trenton, in February, 1852, that he had no confidence in Boylan—told about his giving him a lot, and that his design in doing so was that Boylan should assist in fighting the common council, but he had become satisfied that Boylan was operating against him secretly in favor of the city; said he did not care about offending Boylan until he had got his business settled up with him, which he intended as soon as possible; and he intended to take his business out of his hands; and he expressed his distrust of Mr. Boylan to *Mr. Hull* in the winter of 1851–2.

There is a good deal of evidence, however, that his opinion of Mr. Boylan underwent frequent changes, and that the idea of leaving the park property to him to fight the city with had been in his mind. I do not attach any importance to the fact, that he continued up to his death to employ Boylan professionally, for he had already paid him for these services by conveying some property to him, and it was quite natural that he should go to him, even though he doubted or disliked him. But *Mr. Harriot* speaks of a conversation, in November or December, 1851, in which deceased said he was going to leave Boylan part of his property to carry on the suit with the city. Several other witnesses are produced who heard the deceased, in the winter of 1851–2, or spring of 1852, speak favorably of Mr. Boylan as his friend, as having done his business satisfactorily—and mention Boylan's family in terms which indicated that he was pleased with them. This evidence, in connection with Mrs. Trimble's, goes in corroboration of the testimony as to the actual execution of a will at Hoyt's in which Boylan had an interest, but it also indicates that the devise to him had a specific purpose, to wit, the resistance of the attempt of the city of Newark to take his property for a park. But there is not in it *that* which, in the face of the conflicting testimony, satisfies my mind that the deceased, on the 12th January, made, in substance, an unconditional and absolute devise of so large

an amount to Mr. Boylan, and adhered to it up to the day of his death.

Nor, upon the most careful examination of the evidence, am I able to see that the attempt to prove a clear recognition by him of the will of January 12th as an existing will has been successful. It is said this may be accounted for upon the testimony of the Hoyts that the deceased desired the will to be a *secret*. But the will, according to the witnesses at Hoyt's, was not intended to be so very secret. It was executed, they say, in the presence of five persons, two only being necessary; the will was read over to them all, which was quite unnecessary, and the deceased *took it away to show to friends*. True, *Mr. Nichols* testifies that deceased told him, in February, 1852, that there was no need of his setting apart funds to defeat the law authorizing his lands to be taken; that he had made provision in his will to have it carried up to the highest court of appeal or the highest court in the United States. But then there is *no such provision in the paper here produced as a will*—all we find there is the simple expression of a *wish*, a *desire*, that Boylan should contest the matter in the courts of New Jersey, and he is left to do it at his own expense, if he thinks fit—that is the amount of it. Mr. Heaton speaks of conversations with the deceased about the Methodist Church in Newark (to which $500 is given in this paper, and nothing in the will of September, 1851,)—and says, on one occasion deceased said " that I (witness) would find he had not forgotten it; that he *should do* something pretty nice for us." He *thinks* that conversation was in the winter of 1851–2; but this language has no manifest reference to a *bequest* he had made, or intended to make—it more naturally signifies that he intended, and would make them a *donation;* this was what the witness was pressing him for. The Rev. Mr. Fort's testimony is somewhat relied on to prove a recognition by the testator of the will of January, 1852. It will be remembered that, by the will of 1848, $1000 was bequeathed to the Methodist Church at New Providence. That legacy was omitted in the will of September,

1851, and is found inserted in this paper offered for probate. Mr. Fort says, that in a conversation he had with the deceased in *May*, 1852, a little before his decease, he told him " it was his *intention* to leave us $1000 towards the erection of a new church, provided we expended $4000 ;" [the bequest in the contested will is " $1000 when they build a new church which shall cost $3000, provided it is built in three years after my decease."] " I wished to know," says the witness, " whether the legacy would be available upon his death"— " whether it was in lands or money." He stated it was a specific legacy from residuary property; that if his executors were careful in settling up his estate there would be no difficulty about our bequest. I thanked him for the offer, and told him pleasantly that we would erect a *monument* to his memory. He stated that he had made arrangement for a monument. But much of the force of this testimony, as well as that of Mr. William G. Lord, to the effect that, in April, 1852, the deceased told him that he had been making a will recently, and had left $1000 to this church, is neutralized by that of Mr. Levi Clark; for it will be remembered that, as late as May, 1852, deceased was arranging with Mr. Clark to have a codicil prepared bequeathing this very amount to that church project; and it is not improbable that, speaking with Mr. Fort and Mr. Lord, he may have referred to a thing *as done* which he was *about to do*. As to the *monument*, making " arrangement for a monument," by no means necessarily implies a direction to that effect by will. Again, Mr. Fort says he told Mr. Meeker that he understood he intended to leave the farm, the homestead, and some $30,000 besides, to Mr. Muir; that deceased said, " it is not so ; I shall only leave him a few thousand dollars, and that is all"—all what ?—" *all besides the farm*," is quite as natural an interpretation as, " all I shall leave him is a few thousand dollars," which is the interpretation the counsel for the will put upon it; and the September will leaves Muir the farm, &c., and $2000, while the *contested will* gives him *a house and* $1000, a provision *totally at variance with*

*what* deceased told Mr. Fort he had made for him.   There
is another part of Mr. Fort's testimony which is relied on
to make out a recognition by the deceased of the January
will as in existence.   It is the conversation the witness
had with him in his last sickness, a few days before his
death.   Mr. Fort, on that occasion, pressed upon him, as
he says, " the importance of giving the money (the $1000 to
the church) in his lifetime, that he might see the good of
it, and be his own executor," and wanted to get his name
to a note or a subscription paper for the amount; but he
says the deceased refused—said his matters were all ar-
arranged—he did not like to disarrange them—that "he
*had designed* to leave us the $1000; that his temporal
matters were all arranged, and he did not wish to disar-
range them."   Taking the whole of this conversation, it
makes against the contested will, and not for it.   The de-
ceased did not say, according to the evidence, in this last
conversation, that he *had* bequeathed a legacy to the church,
but that *he had designed to do it*—which Mr. Clark's tes-
timony shows to have been the fact.   Mr. Fort's impression,
derived from his various conversations with the deceased,
doubtless was that $1000 was left to the Methodist Church
at New Providence by the will; but it seems equally clear
that he also got the impression that a like sum was left in
the will to the Presbyterian Church in the same place, which
is not found in either the September will or in this paper.

    I have already alluded to the extraordinary fact in this
cause, that *it has never been discovered who drew this paper.*
And I cannot but think it somewhat extraordinary that the
fact of Mr. Meeker's bringing back and depositing with Mr.
Hoyt the paper executed by him on the 12th January is left
to rest *upon the testimony of Hoyt alone.*   His credit was
attacked, and no counter testimony taken to rebut that at-
tack.   The account he gives of it is, that from one to three
weeks after Meeker left his house on the 13th, the day after
the execution, taking the paper with him, he came to his
(Hoyt's) house, about ten o'clock in the morning, and said

(I give his words) " he wished me to take the will again that was executed at my house. I took it, and then said I would keep it for him, as I found it was the cheapest way to satisfy him. He then asked me to put a new envelope on it, as the old one had got quite dirty and some torn. I did so. He then asked me to put on a seal—to seal it up. I *sent for a candle and sealing-wax*, and did so. He then asked me, or told me, to write ' Jonathan M. Meeker's will, of New Providence, Essex county, New Jersey.' He wrote it, in the first place, with a pencil, and I then wrote on the envelope—' Not to be opened until ten days after my decease.' He then asked me to put *my* signature under it; I told him I would not do it—there was no necessity for it. He then went on trying to show me the inconsistency of what I had said, and in order to get rid of him, I thought it would be the shortest way to write my name, and I did so. I then carried the will up stairs, and put it with my valuable papers; came down, and told him that I must go away, as I was obliged to take the Philadelphia train at one o'clock for New York at Elizabethtown. We both left the house at the same time." Now, in the first place, I cannot understand why Mr. Meeker should have taken so much pains to keep his own handwriting from appearing on this envelope—why he should write on paper with a pencil the words Mr. Hoyt should put on the envelope, instead of endorsing it himself—why not sign with his own hand, at least, the direction about the envelope not being opened. As the endorsement stands, signed by Hoyt, it is an absurdity—signed by Meeker it would have been proper and intelligible. Meeker was in the habit of writing, and wrote a good hand for an old man. In the second place, this transaction does not appear to have been a secret one—why is there no evidence corroborating Mr. Hoyt's account of this visit? Where and who is the person that was *sent for the candle and sealing-wax*? Did nobody see Mr. Meeker on that occasion, or know of the purpose of his visit but Mr. Hoyt? Mr. Hoyt's testimony goes to intimate that he was reluctant all along to have anything to do

2 G*

with this will—that especially he desired not to be the depositary of it—and yet he produces this paper without a particle of testimony, except his own, that it was ever deposited with him by Meeker, and without a single stroke of Meeker's hand on the will or the envelope, except the signatures to the will, which were absolutely indispensable. If Mr. Hoyt had exhausted all his ingenuity in throwing doubts over this whole transaction it could hardly have been done more successfully.

Now, I take it, the facts stand thus upon the evidence.

1. It is proved that the deceased executed a will at Mr. Hoyt's house on the 12th January, 1852, and *took it away with him.*

2. The deceased was, at the time, of memory and understanding sufficient to make a valid will.

Then here is a paper propounded for probate, alleged to be the paper executed on the 12th January as his will, and it is met—

1. By a variety of suspicious circumstances—as to its place of deposit—its dissimilarity to all former wills of the deceased in point of form and detail—in an unknown handwriting—the genuineness of the signatures of the deceased questioned—the conduct of Mr. Hoyt, who produces it, and of Mr. Boylan, a very large beneficiary in it, open to criticism—a previous will carefully drawn by the testator found in his house among his papers uncancelled, and bearing date only three months and seventeen days before—and a large mass of evidence showing conclusively that, with very few exceptions, in all the conduct and conversations of the testator, from September, 1851, to the time of his last sickness, he acted on and distinctly recognized the provisions found in the will of September as the provisions of his last will and testament—never directly spoke of the January will, and in but few instances gave any intimation of such a disposition of his property as is found in this paper; and even when he does refer to some such provisions, they are not entirely in accordance with those we here find, or are entirely recon-

cilable with the belief that he had made a will somewhat different from that of September, and had destroyed it—and the question left for consideration is, whether the evidence of identity—the proof that this is the paper executed at Hoyt's —is sufficiently clear and conclusive to stand against the mass of evidence that conflicts with it.

Four witnesses—Mrs. Hoyt and her three daughters—are the only *reliable* witnesses upon this question. They saw a will executed—they saw the paper, as the testator held it in his hands and as he read it, or read some part of it. They saw it lying on the table in the process of execution. No one of them had it in her hands or examined it. It was by candlelight, between seven and ten at night. One of the four, Anna, signed it—they all saw the testator sign it. He talked about the different provisions, and generally about his property, relatives, and affairs during the time he had the paper there—talked for an hour and a half. The paper was *then put in his pocket or pocket-book by the testator*, and these witnesses saw no more of that paper then.

Some time after—two or three weeks they think—one of them, and another, and another, saw an envelope, endorsed as and undoubtedly the one produced, among Mr. Hoyt's papers. How it came there they have no personal knowledge. This envelope remains in Mr. Hoyt's possession until about the second of June, when he formally *breaks the seal in their presence, produces from it the paper now offered for probate, and reads it to them*. He says it is the will executed on the night of the 12th—he so informed them—and *Anna Hoyt* says she recognized it as the same paper when the envelope was removed. *Elizabeth* says it is the same will she saw executed. *Mrs. Maria L. Hoyt* says she identifies it as the same, and upon reading it now has no doubt it is the same read at her house, and she gives the reason why she recollects several of the bequests. And *Mary L.* says she should think, from the appearance, this is the same paper—the same handwriting in the body of it. They all speak with confi-

dence, too, as to the genuineness of the signatures, and I do not doubt that they speak what they believe to be the truth.

This, under any ordinary circumstances, would doubtless be conclusive. But when it is weighed against the testimony on the other side, is it sufficient to produce conviction? Are not these witnesses deceived? It was nearly five months since they had seen the will executed that this paper was produced. It was then produced under circumstances which awakened no suspicion in their minds—they had understood all along that *the will* was in that envelope—when opened, Mr. Hoyt produced it *as the will. Anna* testifies some three weeks after this—*Elizabeth* nearly seven months after—*Maria L.* eight months after, and *Mary E.* nearly eleven months after. How easily after this lapse of time the witnesses, especially the last three, might confound the impression made upon their minds by this paper, shown and read to them *in June*, with their recollections of that they saw by candlelight on the 12th of *January.*

The grounds upon which these witnesses rest their belief that this is the same paper are—1. The *general appearance* of the handwriting in the body of it. Now, if this is a surreptitious paper, it is not impossible or improbable that it was drawn by the same person who actually drew the paper executed in January. But independent of this, I think, as a general truth, a strange handwriting, seen casually by candle-light, is seldom very accurately remembered after so long a time, unless when first seen the attention of the witness is very specially called to some peculiarity in it or about it. Then—2. The witnesses recognize the *signatures.* Anna Hoyt believes she recognizes her own signature there. Now, as to this, experience teaches us that it is no very difficult thing to make the *fac simile* of a signature a thing so perfect that the keenest expert may be deceived, when the party making it has possession of the genuine signatures to be imitated. Then the last ground of recognition is the *contents* of the paper. But the will actually executed in January had, it is to be presumed, devises or bequests of some kind

in it to every party named in this paper, and its general contents were no doubt, in all these particulars, very much as the witnesses testify. Yet how easily, if that paper was destroyed, might a substitute for it be prepared making changes in the dispositions, as to some of the parties, of the most vital character, which would not be observed by these witnesses after hearing Mr. Meeker read and talk about a will, his property, his relations, and affairs for an hour and a half. No doubt the attention and curiosity of these witnesses were awakened by the singular circumstances of Mr. Meeker coming there to execute a will; but they cannot tell how many leaves it was written on, though this paper has but *three*, nor how many times the deceased wrote his name on the margins, though written here but *three* times.

The deceased was very much in the habit of making wills. Several of his old wills and fragments of old wills are produced. Hoyt had once drawn a will for him, of which nothing has been heard. One of his last acts was to try and get Mr. Clark to prepare a codicil. He made wills, and had them made for him; soon changed his mind, and cancelled or destroyed them. It seems to have been an inveterate habit with him, too, to talk about his wills and the bequests he had made. So that there is nothing incredible in the supposition that such a will as is found was made by him in January, and afterwards destroyed by him. It would be in vain, and worse than in vain, to speculate as to how this strange state of things has been brought about, or who are implicated in it. It cannot be denied that clouds and shadows hang about the case—that it is full of difficulties,—but we must tread our way by the best lights we have. That which convinces the judgment must be taken as the truth of the case. I cannot say that Mrs. Hoyt and her daughters are perjured—it would be as unjust as cruel to say it—the evidence does not warrant me in saying it. Then a will *was executed* in January. The deceased was then of sound and disposing mind and memory. Upon the testimony in this cause I should violate every settled rule of decision upon

such questions to deny it. Yet the testimony is to my mind *conclusive* that the deceased never, in the last months of his life, dreamed even that the will of September was not his last will; to question that would be, it seems to me, to give the lie direct to all he did and said in the latter part of his life. I find it impossible to bring my mind to the belief that this paper is his will. The Orphans Court, from which this appeal comes up, after the long and laborious investigation they gave this question, decided unanimously on all the facts that it was not his will, and I cannot on my conscience say they were wrong. I am therefore bound to advise his Honor the Ordinary that the decision of the court below be affirmed, *so far* as it *denies probate of this will.* As to that part of the decree which denies *costs and expenses* to the party propounding this paper for probate out of the estate, after much hesitation, I have come to the conclusion that there should be a *reversal*, on the ground that the caveators have not made out by direct proof any fraud as against Boylan, or any direct knowledge on his part that this paper was surreptitious at the time he offered it for probate. It did not come from his custody. He was named in it as executor. It may be he honestly believed it to be the paper it purported to be. His connection with it is unfortunate; but he ought not to be condemned, upon suspicion merely, to the heavy costs and expenses of conducting these proceedings; I am therefore disposed to advise his Honor the Ordinary that the costs and reasonable counsel fees of the party propounding this paper for probate should be paid out of the estate. This seems to me the more reasonable, from the fact that the competency of the deceased to make a will was put in issue by the caveators, and has been sustained.